**METALLIZING ENGINEERING CO., Inc., v. KENYON BEARING & AUTO PARTS CO., Inc., et al.**

**No. 131.**

Circuit Court of Appeals, Second Circuit.

Jan. 10, 1946.

Writ of Certiorari Denied May 6, 1946.

See 66 S.Ct. 1016.

Morris Kirschstein, of New York City, and Clifford H. Bell, of Hartford, Conn., for appellants.

Louis Burgess, Burgess & Dinklage, and Ralph D. Dinklage, all of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

---

L. HAND, Circuit Judge.

The defendants appeal from the usual decree holding valid and infringed all but three of the claims of a reissued patent, issued to the plaintiff's assignor, Meduna; the original patent issued on May 25, 1943, upon an application filed on August 6, 1942. The patent is for the process of "so conditioning a metal surface that the same is, as a rule, capable of bonding thereto applied spray metal to a higher degree than is normally procurable with hitherto known practices" (p. 2, lines 1-5). It is primarily useful for building up the worn metal parts of a machine. The art had for many years done this by what the patent calls "spray metal," which means metal sprayed in molten form upon the surface which it is desired to build up. This process is called "metalizing," and it had been known for nearly thirty years before Meduna's invention; but about fifteen or twenty years ago it was found that, to secure a satisfactory bond between the "spray metal" and the surface, the surface must be roughened so that there would be fine undercut areas in it upon which the sprayed surface could take hold; and of course the surface must itself be clean. The art had developed two ways of producing such a surface; one, by sand-blasting, and the other, by a tool, so adjusted in a lathe as to tear tiny channels: "screw-threading." Meduna's invention was to prepare the surface by first depositing upon it a preliminary layer of metal by means of a process, disclosed in Patent No. 1,327,267, issued to Brewster and Weischan, on January 6, 1920. This process was practiced by what the art knew as the "McQuay-Norris" machine, which was "more particularly adapted and intended for use in the filling of cavities which may occur in castings or other metal objects" (p. 1, lines 17-20). The "McQuay-Norris" device was operated by electric power, one terminal of the circuit being connected with the work, and the other being a fusable electrode, which melted at the temperature developed in the circuit, and deposited parts of itself at the places desired upon closing of the circuit by contact with the work. The process was described as follows (p. 2, lines 47-57): "The electrode is moved from spot to spot in the cavity and the foregoing operation repeated until the surface of the blow-hole is covered by a deposit of the metal by the electrode. It will thus be seen that the surface of the blow-hole is covered by a number of small particles of metal of the electrode, all of which particles are welded to the particular portion of the surface of the blow-hole with which the electrode contacted." After this has been done, "a peening hammer is employed to peen the metal which has been introduced into the blow-hole, thus causing the metal to be compacted, and any inequalities of the surface of the metal reduced" (p. 2, lines 63-68). Meduna did not peen the metal, indeed peening would have been entirely unfitted to his purpose, as it would have pressed together the undercut deposits which later serve to catch and hold the "spray metal." Moreover, his purpose was not to fill up "blow-holes," or fissures; but, as we have said, to prepare worn surfaces for rebuilding. However, he used the McQuay-Norris machine unchanged, prescribing a voltage of preferably not more than twenty volts—ordinarily between two and nine—and an amperage of between two hundred and three or four hundred. The surface was to be "repetitiously contacted and preferably repetitiously contact stroked with the electrode on successive areas, the stroking action depositing on these areas small amounts of electrode material firmly bonded thereto. Alternatively the electrode may be applied with a stippling action to the metal surface. While these procedures essentially involve breaking and making contact between the metal surface and the electrode, it is also possible, and sometimes advisable, to move the electrode relative to the base while maintaining resistant heating contact therebetween" (p. 2 lines 72-76; p. 3, lines 1-8).

The only question which we find necessary to decide is as to Meduna's public use of the patented process more than one year before August 6, 1942. The district judge made findings about this, which are supported by the testimony and which we accept. They appear as findings 8, 9, 10, 11, 12 and 13 on pages 46 and 47 of volume 62 of the Federal Supplement; and we cannot improve upon his statement. The kernel of them is the following: "the inventor's main purpose in his use of the process prior to August 6, 1941, and especially in respect to all jobs for owners not known to him, was commercial, and * * * an experimental purpose in connection with such use was subordinate only." Upon this finding he concluded as matter of law that, since the use before the critical date—August 6, 1941—was not primarily for the purposes of experiment, the use was not ex-

cused for that reason. Smith & Griggs Manufacturing Co. v. Sprague, 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141; Aerovox Corp. v. Polymet Manufacturing Corp., 2 Cir., 67 F.2d 860; 862. Moreover, he also concluded that the use was not public but secret, and for that reason that its predominantly commercial character did prevent it from invalidating the patent. For the last he relied upon our decisions in Peerless Roll Leaf Co. v. Griffin & Sons, 29 F.2d 646, and Gillman v. Stern, 114 F.2d 28. We think that his analysis of peerless Roll Leaf Co. v. Griffin & Sons, was altogether correct, and that he had no alternative but to follow that decision; on the other hand, we now think that we were then wrong and that the decision must be overruled for reasons we shall state. Gillman v. Stern, supra, was, however, rightly decided.

Section one of the first and second Patent Acts, 1 Stat. 109 and 318, declared that the petition for a patent must state that the subject matter had not been "before known or used." Section six of the Act of 1836, 5 Stat. 117, changed this by providing in addition that the invention must not at the time of the application for a patent have been "in public use or on sale" with the inventor's "consent or allowance"; and § 7 of the Act of 1839, 5 Stat. 353, provided that "no patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application for a patent * * * except on proof of abandonment of such invention to the public; or that such purchase, sale, or prior use has been for more than two years prior to such application * * *." Section 4886 of the Revised Statutes made it a condition upon patentability that the invention shall not have been "in public use or on sale for more than two years prior to his application," and that it shall not have been "proved to have been abandoned." This is in substance the same as the Act of 1839, and is precisely the same as § 31 of Title 35, U.S.C.A. except that the prior use is now limited to the United States, and to one year before the application. § 1, Chap. 391, 29 Stat. 692; § 1, Chap. 450, 53 Stat. 1212, 35 U.S.C.A. § 31. So far as we can find, the first case which dealt with the effect of prior use by the patentee was Pennock v. Dialogue, 2 Pet. 1, 4, 7 L.Ed. 327, in which the invention had been completed in 1811, and the patent granted in 1818 for a process of making hose by which the sections were joined together in such a way that the joints resisted pressure as well as the other parts. It did not appear that the joints in any way disclosed the process; but the patentee, between the discovery of the invention and the grant of the patent, had sold 13,000 feet of hose; and as to this the judge charged: "If the public, with the knowledge and tacit consent of the inventor, be permitted to use the invention, without opposition, it is a fraud on the public afterwards to take out a patent." The Supreme Court affirmed a judgment for the defendant, on the ground that the invention had been "known or used before the application." "If an inventor should be permitted to hold back from the knowledge of the public the secrets of his invention; if he should * * * make and sell his invention publicly, and thus gather the whole profits, * * * it would materially retard the progress of science and the useful arts" to allow him fourteen years of legal monopoly "when the danger of competition should force him to secure the exclusive right" 2 Pet. at page 19, 7 L.Ed. 327. In Shaw v. Cooper, 7 Pet. 292, 8 L.Ed. 689, the public use was not by the inventor, but he had neglected to prevent it after he had learned of it, and this defeated the patent. "Whatever may be the intention of the inventor, if he suffers his invention to go into public use, through any means whatsoever, without an immediate assertion of his right, he is not entitled to a patent" 7 Pet. at page 323, 8 L.Ed. 689. In Kendall v. Winsor, 21 How. 322, 16 L.Ed. 165, the inventor had kept the machine secret, but had sold the harness which it produced, so that the facts presented the same situation as here. Since the jury brought in a verdict for the defendant on the issue of abandonment, the case adds nothing except for the dicta on page 328 of 21 How., 16 L.Ed. 165: " the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress." In Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755, although the patent was for the product which was sold, nothing could be learned about it without taking it apart, yet it was a public use within the statute. In Hall v. Macneale, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367, the situation was the same.

In the lower courts we may begin with the often cited decision in Macbeth-Evans Glass Co. v. General Electric Co., 6 Cir., 246 F. 695, which concerned a process pat-

ent for making illuminating glass. The patentee had kept the process as secret as possible, but for ten years had sold the glass, although this did not, so far as appears, disclose the process. The court held the patent invalid for two reasons, as we understand them: the first was that the delay either indicated an intention to abandon, or was of itself a forfeiture, because of the inconsistency of a practical monopoly by means of secrecy and of a later legal monopoly by means of a patent. So far, it was not an interpretation of "prior use" in the statute; but, beginning on page 702 of 246 F. 695 Judge Warrington seems to have been construing that phrase and to hold that the sales were such a use. In Allinson Manufacturing Co. v. Ideal Filter Co., 8 Cir., 21 F.2d 22, the patent was for a machine for purifying gasoline: the machine was kept secret, but the gasoline had been sold for a period of six years before the application was filed. As in Macbeth-Evans Glass Co. v. General Electric Co., supra, 6 Cir., 246 F. 695, the court apparently invalidated the patent on two grounds: one was that the inventor had abandoned the right to a patent, or had forfeited it by his long delay. We are disposed however to read the latter part—pages 27 and 28 of 21 F.2d —as holding that the sale of gasoline was a "prior use" of the machine, notwithstanding its concealment. Certainly, the following quotation from Pitts v. Hall, Fed.Cas.No. 11,192, 2 Blatchf. 229, was not otherwise apposite; a patentee "is not allowed to derive any benefit from the sale or use of his machine, without forfeiting his right, except within two years prior to the time he makes his application." On the other hand in Stresau v. Ipsen, 77 F.2d 937, 22 C.C. P.A. (Patents) 1352, the Court of Customs and Patent Appeals did indeed decide that a process claim might be valid when the inventor had kept the process secret but had sold the product.

Coming now to our own decisions (the opinions in all of which I wrote), the first was Grasselli Chemical Co. v. National Aniline & Chemical Co., 2 Cir., 26 F.2d 305, in which the patent was for a process which had been kept secret, but the product had been sold upon the market for more than two years. We held that, although the process could not have been discovered from the product, the sales constituted a "prior use," relying upon Egbert v. Lippmann, supra, 104 U.S. 333, 26 L.Ed. 755, and Hall v. Macneale, supra, 107 U.S. 90,

2 S.Ct. 73, 27 L.Ed. 367. There was nothing in this inconsistent with what we are now holding. But in Peerless Roll Leaf Co. v. Griffin & Sons, supra, 2 Cir., 29 F.2d 646, where the patent was for a machine, which had been kept secret, but whose output had been freely sold on the market, we sustained the patent on the ground that "the sale of the product was irrelevant, since no knowledge could possibly be acquired of the machine in that way. In this respect the machine differs from a process * * * or from any other invention necessarily contained in a product" 29 F.2d at page 649. So far as we can now find, there is nothing to support this distinction in the authorities, and we shall try to show that we misapprehended the theory on which the prior use by an inventor forfeits his right to a patent. In Aerovox Corp. v. Polymet Manufacturing Corp., supra, 2 Cir., 67 F.2d 860, the patent was also for a process, the use of which we held not to have been experimental, though not secret. Thus our decision sustaining the patent was right; but apparently we were by implication reverting to the doctrine of the Peerless case when we added that it was doubtful whether the process could be detected from the product, although we cited only Hall v. Macneale, supra, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367, and Grasselli Chemical Co. v. National Aniline Co., supra (2 Cir., 26 F.2d 305). In Gillman v. Stern, supra, 2 Cir., 114 F.2d 28, it was not the inventor, but a third person who used the machine secretly and sold the product openly, and there was therefore no question either of abandonment or forfeiture by the inventor. The only issue was whether a prior use which did not disclose the invention to the art was within the statute; and it is well settled that it is not. As in the case of any other anticipation, the issue of invention must then be determined by how much the inventor has contributed any new information to the art. Gayler v. Wilder, 10 How. 477, 496, 497, 13 L.Ed. 504; Tilghman v. Proctor, 102 U.S. 707, 711, 26 L.Ed. 279; Carson v. American B. & R. Co., 9 Cir., 11 F.2d 766, 770, 771; Boyd v. Cherry, C.C. Iowa, 50 F. 279, 283; Acme Flexible Clasp Co. v. Cary Manufacturing Co., C.C.N.Y., 96 F. 344, 347; Ajax Metal Co. v. Brady Brass Co., C.C.N.Y., 155 F. 409, 415, 416; Anthracite Separator Co. v. Pollock, C.C. Pa., 175 F. 108, 111.

From the foregoing it appears that in Peerless Roll Leaf Co. v. Griffin &

520

Sons, supra, 2 Cir., 29 F.2d 646, we confused two separate doctrines: (1) The effect upon his right to a patent of the inventor's competitive exploitation of his machine or of his process; (2) the contribution which a prior use by another person makes to the art. Both do indeed come within the phrase, "prior use"; but the first is a defence for quite different reasons from the second. It had its origin—at least in this country—in the passage we have quoted from Pennock v. Dialogue, supra, 2 Pet. 1, 7 L.Ed. 327; i.e., that it is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly. It is true that for the limited period of two years he was allowed to do so, possibly in order to give him time to prepare an application; and even that has been recently cut down by half. But if he goes beyond that period of probation, he forfeits his right regardless of how little the public may have learned about the invention; just as he can forfeit it by too long concealment, even without exploiting the invention at all. Woodbridge v. United States, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159; Macbeth-Evans Glass Co. v. General Electric Co., supra, 6 Cir., 246 F. 695. Such a forfeiture has nothing to do with abandonment, which presupposes a deliberate, though not necessarily an express, surrender of any right to a patent. Although the evidence of both may at times overlap, each comes from a quite different legal source: one, from the fact that by renouncing the right the inventor irrevocably surrenders it; the other, from the fiat of Congress that it is part of the consideration for a patent that the public shall as soon as possible begin to enjoy the disclosure.

It is indeed true that an inventor may continue for more than a year to practice his invention for his private purposes or his own enjoyment and later patent it. But that is, properly considered, not an exception to the doctrine, for he is not then making use of his secret to gain a competitive advantage over others; he does not thereby extend the period of his monopoly. Besides, as we have seen, even that privilege has its limits, for he may conceal it so long that he will lose his right to a patent even though he does not use it at all. With that question we have not however any concern here.

Judgment reversed; complaint dismissed.