Paul **ROBINE** and Walter C. Lambert, Plaintiffs,

v.

**APCO, INC.**, a New York Corporation, Practical Products, Inc., a New York Corporation, and United States Hoffman Machinery Corporation, a Delaware Corporation, jointly and severally, Defendants.

United States District Court
S. D. New York.

March 3, 1964.

George J. Engelman, New York City, for plaintiffs; John C. L. Cowen, Frank C. Sibley, Detroit, Mich., of counsel.

Harry Price, New York City, for defendants.

DAWSON, District Judge:

This is an action involving two causes of action, (1) breach of confidence by im-

proper use of trade secrets, and (2) patent infringement. Trial was demanded before a jury on both issues. Trial was begun before a jury because certain of the relief requested in the complaint was legal in nature. Robine v. Ryan, 310 F.2d 797 (2d Cir. 1962). See, Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

## THE FACTS

The plaintiffs, Paul Robine and Walter C. Lambert, were two young engineers working for the Ford Motor Company in Detroit. In the latter 1940s they became interested in the possibility of developing a business in automatic dispensing machines dispensing hot and cold drinks. They formed a partnership for this purpose which lasted for a short time. About 1950 they purchased five Chef-Way machines for dispensing hot coffee. They became interested in the idea of dispensing hot chocolate. They found that the machines then in use did not dispense a generally acceptable hot chocolate drink because the chocolate was not completely dissolved with the hot water. They commenced experimentation to see if some device could be added to a machine which would produce a more completely whipped or homogenized drink. Mr. Robine testified that the invention for which they claimed the patent was made by him in 1951. He stated that the invention was the "whipping device" that was put in the machine and the combination of this whipping device with the other elements of an automatic dispensing machine for dispensing hot drinks. Having made such a device they then modified one of the Chef-Way machines in the early part of 1951 by incorporating this device. (Robine, R. 48). All five Chef-Way machines were then being operated by them in various locations; the one modified with the whipping device was located at the Wayne County Airport. This was modified with a whipper. (Robine, R. 54).

The two plaintiffs built a small counter model of a dispensing machine "probably in 1951, and we improved on it." This machine had a whipping device "exactly the same as the unit which is pictured and described in our United States patent." (Robine, R. 89). This machine was placed in a roller skating rink on Eight Mile Road outside of Detroit.

On November 25, 1955, an application for a patent was filed by the plaintiffs on a dispensing machine for producing hot drinks. In its broad application plaintiffs conceded that the patent was invalid, since hot drink dispensing machines had been developed long before plaintiffs entered the field. However, plaintiffs contend that the whipping unit in the machine is new with them and that the patent, restricted to that claim, is valid. The claims relied upon are claims 1, 4, 7 and 8 of the patent. Claim 4 covers the whipping unit; claims 1, 7 and 8 are combination claims covering the whipping unit in combination with the vending machine for producing hot drinks. The whipping unit is perhaps more properly called a "flow through type mixer." It is inserted in the delivery tube between the blender bowl and the discharge spout through which the water and chocolate pass. It provides a means of thoroughly mixing the chocolate with the water so that the hot chocolate will taste smooth and the chocolate will not settle to the bottom of the cup. It is composed of a unit through which the chocolate and water pass which has in it a whipping unit composed of a shaft with rotating blades, power driven, which revolve as the ingredients pass through it.

At about the same time that plaintiffs were engaging upon their experimentation, apparently other persons in the industry were also making similar experiments. On March 8, 1955, R. E. McCauley, of Los Angeles, California, filed an application for a patent on a beverage making machine which, in Figure 10 of the patent as finally issued, covered exactly the same device as claimed by the plaintiffs.

The file wrapper of the patent involved in suit shows that an interference was declared between the patent granted to the plaintiffs (which was granted as

patent No. 2,796,200 on June 18, 1957) and the application of Mr. McCauley, since Claim 4 of the Lambert and Robine patent and Claim 42 of the McCauley application seem to cover the same invention. It appears from the interference file, which was introduced in evidence as Plaintiff's Exhibit 25, that certain settlement negotiations took place between Mr. McCauley and Mr. Lambert and Mr. Robine, and that on March 10, 1960 Mr. McCauley executed a consent that the interference proceeding be determined in favor of Messrs. Robine and Lambert. The Board of Interference Examiners therefore on May 5, 1960 decided the interference favorably to Mr. Robine and Mr. Lambert. Depositions were taken on the interference proceedings which were received in evidence.

Messrs. Lambert and Robine claim that their invention was developed in the early part of 1951 (Robine, R. 44). They installed the patented device of the whipper in a machine at Wayne County Airport. This was installed in 1951 and had the patented device in it. This machine was used on a commercial basis.*

So as early as 1951 the plaintiffs had developed their patented device and had installed it in a machine which was being used commercially in the Detroit area. They admitted that the machine was used for dispensing of hot chocolate by people who put coins in the machine and received the hot chocolate. The contention that it was a secretive use depended on the fact that the machine was a locked machine so that the inside machinery could not be observed. This did not prevent it from being in commercial use.

It is now the contention of the plaintiffs that although this was a commercial use of a patented device, nevertheless it was an experimental use. However, as the testimony showed, the experiment was not on the whipping device but on the chocolate delivery system above the whipper device.

"Q. In connection with the period June 1952 to December 1952, did you state among the changes you made were the change in delivery means?

"A. No. Our problem was not with this flow-through mixer. Our problems were in the hopper, the hopper feed. This was primarily our big problem there.

\*     \*     \*     \*     \*

"Q. In other words, from June 1952 to December 1952 the whipper or the homogenizer, or whatever else you want to call this device here, which consists of the rapidly rotating disc, 18, or a similar disc, which is Exhibit 15A, operated satisfactorily, and the only trouble was with the delivery means or the hopper above it, is that correct?

"A. The device as we have on exhibit here, the operation of that was satisfactory, as far as we know, and our main problem was the chocolate delivery system.

"Q. And how did you change the chocolate delivery system?

"A. The pure—well, I can describe that, too. The changes that were not really to the chocolate delivery system. We used such things as vibrators solenoid thumpers to thump the side of our hopper to cause the chocolate to flow down into the cavitated areas of our auger.

"We tried automatic stir rods that were motor-actuated, and all these were not really solutions to the flow-

---

\* "THE WITNESS: The first one was built in approximately 1951.
"THE COURT: And did that have your patented device?
"THE WITNESS: It had our patented device in it.
"THE COURT: And was it used commercially?

"THE WITNESS: It was used commercially on a secretive basis.
It was not available for public inspection. It was an experiment.
"Q. Was it dispensing hot chocolate commercially?
"A. It was dispensing hot chocolate commercially, yes, sir."
(Lambert, R. 35)

ability problems of the chocolate." (Lambert, R. 245–6)

The experimentation was not on the patented device, but on parts of the machine not patented which were adjacent to the patented device. The testimony of the plaintiffs showed also that during this period they experimented with the type of chocolate to be used and when they finally got a particular type of chocolate manufactured by the Baker Company they found that they had no more trouble.

It appears from the testimony of both plaintiffs in the interference proceedings that the new type of chocolate was obtained in April of 1953. From that time on no experimentation of any type was done on the machine located at the Wayne County Airport. The machine remained in operation at that location until at least March of 1954.

On November 25, 1955, after the invented device had been in operation for several years, plaintiffs filed an application for a patent. The patent was finally issued on June 18, 1957.

In the deposition of Mr. Robine taken in the interference proceeding, he testified as follows:

"XQ–473 Didn't you state in a conversation with Mr. McCauley that there was such use of your machine as would knock out both of you so far as a patent was concerned?

"A I don't recall making a statement like that.

"There was some question in my mind, inasmuch as the machine had been used and used by the public more than one year prior to our application date, that it was a public use item.

"However, in later going back through this and in talking to Mr. Cowen, it was explained to me by Mr. Cowen that inasmuch as the machine was in a locked cabinet and was kept in a secretive and operated in a secretive manner, and that those purchasing chocolate from the machine did not have any way or knowledge of knowing how the inner mechanism or how the machine functioned, that this was not regarded or would be regarded as a public disclosure.

"XQ–474 Didn't you state to Mr. McCauley that you had a public use that would knock you both out?

"A I don't recall making a statement as you are expressing it. I suspicioned that maybe that might be the case, and, as I have mentioned, I have later reviewed this with Mr. Cowen, because I am not a patent attorney, as I keep—

"XQ–475 (Interposing) All I am asking you is whether you stated to Mr. McCauley that you had a public use that would knock you both out?

"A I did not state that.

\*     \*     \*     \*     \*

"A \* \* \* I do recall, to be quite truthful about it, that there was conversation along that line between myself and Mr. McCauley. However, actually that was Mr. McCauley's statement and not mine.

"XQ–479 You mean he presented you with a statement that your machine was in public use?

"A No. I told Mr. McCauley that my machine had been used by the public considerably before one year and even considerably before one year before his alleged date, and it was a matter that I wasn't clear on at all; and Mr. McCauley said at that time, "Well," he said, "at that rate"—I am trying to recall his exact words, and at this time I am sure that I can't, so I don't want to misquote it, so I will have to say generally that he stated that we both had a public use that would knock each other out, something to that effect. I think that is the origin of your questioning." (Robine deposition in interference proceeding, p. 488–489, part of Plaintiff's Exhibit 25)

In the meantime, the plaintiffs who were constantly engaged in the exploitation of the dispensing machines, had pur-

chased some machines for dispensing drinks from Apco, Inc. through a Mr. Danny Gould, a Western sales representative of Apco, Inc. (Robine, R. 3). Plaintiffs believed that the whipper device which they had invented and on which they had a patent would improve the Apco machines. A conference took place between the plaintiffs and Mr. Gould in Detroit in 1958 at which they explained the nature of their device and showed him the device in the machine at the Wayne County Airport. Mr. Gould apparently expressed some interest in the device. The plaintiffs, apparently, were intending to endeavor to secure a license arrangement with Apco, Inc. On July 15, 1958 Mr. Robine wrote Mr. Gould a letter reading in part as follows:

> "In accordance with your request, I am enclosing herewith a copy of our U. S. Patent # 2,796,200 and letters relative to infringements by BarVend, and Nestle's.

> "If satisfactory arrangements can be made between Apco and ourselves, we would be pleased to grant an exclusive license to Apco for *all* applications (Vending Machines, Conversions, and Fountain Counter Models) of subject patent.

> "I hope the submitted information will suffice your needs. * * *"

On October 7, 1958, Mr. Robine sent to Mr. Gould a model of the whipper device which was delivered to Mr. Gould in Minneapolis.

It appeared, however, that Apco, Inc. had itself been working through a Mr. Joschko on the development of a device similar to that manufactured by the plaintiffs. Mr. Joschko had developed a device which Apco considered satisfactory. Apco, therefore, was not interested in plaintiffs' machine. The model of the machine was returned to Mr. Robine. There was no indication in the evidence that Mr. Joschko had developed his device prior in time to the plaintiffs, nor any indication that he developed his machine after seeing the device of the plaintiffs.

It does appear, however, that subsequently the machines manufactured for Apco, Inc. by its manufacturing subsidiary did incorporate a device similar to the whipper device of plaintiffs and of Mr. Joschko.

Plaintiffs contend that this device was a copy of the device which Mr. Robine had sent to Mr. Gould and that since this device had been sent in confidence the use of the machine by Apco, Inc., or its subsidiary, was the improper use of trade secrets.

## THE ISSUES

There were really three issues in the case:

1. Was there a breach of confidence by improper use of trade secrets?

2. Was the patent of the plaintiffs a valid patent?

3. Was the patent infringed by the defendants, or any of them?

## DISCUSSION

■ At the close of the trial, on a motion to dismiss, the cause of action on trade secrets was dismissed as a matter of law on the ground that "[w]hen an idea or invention has been published by the issuance of a patent embodying such invention, a subsequent disclosure thereof cannot be deemed to have been made in confidence so as to give rise to an action for the breach of such confidence and the misappropriation of the idea." Kohloff v. Ford Motor Co., 37 F. Supp. 470, 471 (S.D.N.Y.1940). See also, Larson v. General Motors Corp., 2 F.R.D. 294 (S.D.N.Y.1941). There was no proof offered that the plaintiffs had offered trade secrets to the defendants. Plaintiffs had offered a license on their patented article and no more. The fact that a working model was enclosed does not create any trade secrets. Plaintiff Lambert testified that any mechanic could have produced such a model, given the specifications contained in the patent.

■ This then left merely the issue as to whether there had been an infringement of the patent. This issue was left

for determination by the Court since after the first cause of action had been dismissed legal relief was no longer available. No evidence had been offered as to any damages on the second cause of action. In fact, plaintiffs were no longer requesting damages; to the contrary, an accounting was requested. Although the issues of validity and infringement involve questions of fact and may therefore be properly considered by a jury, there is no right to a jury trial on those issues when the relief requested is wholly equitable. Shubin v. United States District Court, 313 F.2d 250 (9th Cir. 1963), cert. denied, 373 U.S. 936, 83 S.Ct. 1539, 10 L.Ed.2d 690.

This left the issue as to the validity of the patent of the plaintiffs.

Section 102 of Title 35 U.S.C.A., states the conditions required for patentability:

"A person shall be entitled to a patent unless * * *

" * * * *

"(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

"(c) he has abandoned the invention * * *."

The history of this provision has been thoroughly canvassed. See Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1939); Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2d Cir. 1946), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615.

■■ Section 102 requires that an inventor not exploit his own discovery competitively for more than one year before filing an application. The prohibition of the statute is violated even if the process was kept secret and the public were unable to determine the process from the product which was being sold. Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., supra. The cases indicate that a limited commercial use may be permissible for a longer period as long as the process is kept secret and as long as the experimental use is dominant. See, e. g., Aerovox Corporation v. Polymet Mfg. Corporation, 67 F. 2d 860 (2d Cir. 1933); United States Chemical Corporation v. Plastic Glass Corporation, D.C., 142 F.Supp. 840 (N.J. 1956), aff'd 3 Cir., 243 F.2d 892. But it is quite clear that if the use is primarily for the purpose of profit, with the experimentation being only incidental, for a period more than one year prior to the application for a patent, it comes within the prohibition of the statute. Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., supra.

Plaintiffs would not be able to recover even if their purpose was to experiment on the other parts of the machine, e. g., the means of feeding the chocolate into the delivery tube. The use of a device in an experiment on another device does not make the use experimental. In A. Schrader's Sons Inc. v. Wein Sales Corporation, 9 F.2d 306 (2d Cir. 1925) a gauge for pneumatic tires had been invented. Use of the gauge started immediately in connection with experimenting with the manufacture of leather tires. The court held that four or five weeks of such use was no bar since at least that amount of time was necessary to demonstrate the sufficiency of the device. However the court made a clear distinction between experimenting with the tires and experimenting with the gauge. Only the latter type of experiments are permissible. In the case at bar the sufficiency of the whipper device became apparent almost immediately upon its installation in the Chef-Way machine in 1951. Certainly its sufficiency was obvious long before November 25, 1954, a year before the application for the patent. In fact, from April of 1953 the entire vending machine was operating satisfactorily.

The case of Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., supra, concerned a process patent for "so conditioning a metal surface that the same is, as a rule, capable of bonding thereto applied spray metal to a higher

degree than is normally procurable with hitherto known practices." The inventor of this process first achieved satisfactory results in March of 1940. A friend advised him to test the process thoroughly in actual service before attempting to patent it. The patent application was filed on August 6, 1942. Although as late as December of 1941 a job was done for a customer who understood that the job was experimental, the trial court found that the inventor's main purpose in the use of the process prior to August 6, 1941 was commercial and an experimental purpose in connection with such use was subordinate only. L. Hand, for the Court of Appeals, held that the patent was invalid because of prior use:

> " * * * [I]t is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly. * * * if he goes beyond [this one year period] * * * he forfeits his right regardless of how little the public may have learned about the invention; * * * [I]t is part of the consideration for a patent that the public shall as soon as possible begin to enjoy the disclosure." (At p. 520 of 153 F.2d).

The case of United States Chemical Corporation v. Plastic Glass Corporation, 243 F.2d 892 (3d Cir. 1957) concerned a process patent on plastic sheeting containing a simulated mother-of-pearl design. The first sheet was produced on September 27, 1951. The first sales were in November of 1951. The application for a patent was filed on April 8, 1953. Plaintiff contended that the sales were experimental to determine "production controls." Although a test was conducted as late as June 5, 1952, the court held that starting in December of 1951 the experimental use was subordinate only and that the patent was therefore invalid.

■ On the issue of public use, the defendant has the burden of proving the use, but once the use is proved, the plaintiff has the burden of proving that the use was experimental. The case of Aerovox Corporation v. Polymet Mfg. Corporation, 67 F.2d 860 (2d Cir. 1933) concerned a patent for the making of a dielectric condenser and for the condenser so made. The patent was held invalid on the ground of lack of secrecy and of prior use for profit. The remarks of Judge L. Hand on the latter point apply remarkably well to the case at bar:

> "The [sales] * * * were in ordinary course of business; they were commercial in that they were for profit; the customer was not advised that they were experimental; the new process was used indiscriminately with the old. Though it may have been true that the manufacturer hoped in this way to get some light upon how well they worked, the main object was apparently not that. At least the primacy of that purpose is doubtful; the plaintiff has certainly not "shown by 'full, unequivocal and convincing' proof that the sales were mainly to test out the invention. It has failed to meet the undoubted prior use." (At p. 862 of 67 F.2d).

■■ The Court finds that the invention of the plaintiffs was in public use in this country for more than one year prior to the date of application for a patent in the United States and that this use was not an experimental use but was a commercial use.

## CONCLUSIONS OF LAW

The Court concludes as follows:

1. The plaintiffs have presented no facts to establish a cause of action for breach of confidence by improper use of trade secrets.

2. Patent No. 2,796,200 issued to the plaintiffs is invalid since the invention described therein had been in public use for more than one year prior to the date of the application for the patent.

3. Since the patent was invalid, it becomes unnecessary to determine wheth-

er there was any infringement of the patent by any of the defendants.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

Let judgment be entered accordingly.