## THEBERATH v. RUBBER & CELLULOID HARNESS TRIMMING Co.

*(Circuit Court, D. New Jersey. February 6, 1883.)*

1. PATENT LAW—INFRINGEMENTS—PATENTS FOR DESIGNS.
    To properly sustain a defense to a complaint of infringement on the ground that the original patent lacks the quality of novelty, specimens of the articles alleged to have been made before the time of the complainant's invention should be produced in evidence.

2. SAME—PUBLIC USE.
    By the terms of section 4886, Rev. St., no article is patentable which has been in public use or on sale for more than two years prior to application for letters patent, unless the same is proved to have been abandoned.

3. PATENTS FOR DESIGNS.
    Section 4929, Rev. St., provides for patents on any new and original designs, and by section 4933, Rev. St., all regulations and provisions that are applicable to the obtaining or protecting of patents for the inventions of useful articles are made applicable to design patents.

4. SAME—IMPROVING A CONCEPTION NOT AN INVENTION.
    Merely improving the conceptions of another by change in form, proportion, or degree, is not such an invention as will sustain a patent.

In Equity.

*Philip W. Cross*, for complainant.

*Joseph C. Clayton* and *A. Q. Keasbey*, for defendants.

NIXON, J. This is a suit in equity for the infringement of three several letters patent issued to the complainant,—the first, dated

January 18, 1870, and numbered 99,032, for "improvement in the covering of harness trimmings;" the second, a design patent, dated June 13, 1871, and numbered 5,006, entitled "design for harness trimmings;" and the third, dated August 24, 1875, and numbered 167,040, for "improvement in harness mountings." The defendant company have filed their answer, setting up that the patents of the complainant are void for want of novelty and non-infringement. The complainant's patents have reference to improvements in the coverings of harness trimmings. The first was granted on the eighteenth of January, 1870. Up to that time, harness mountings were ordinarily covered with leather, with a single seam in the center, which left a ridge more exposed to wear than the balance of the covering. The wear upon the covering made the trimming less durable than other parts of the harness, breaking the thread, whereby the seam opened and the whole covering was spoiled. The design of the patentee was to avoid this difficulty, by having two seams, one at or near each side, leaving the center smooth and even, so that one part could not wear out sooner than any other. Although he states in his specifications that the covering might be made of any material, whether elastic or non-elastic, expressly including rubber, and that it might be applied to any and every kind of harness trimmings, I think it is probable that the patentee, when the letters patent were applied for, had in his mind only such coverings as needed to be stitched with threads. He wanted to get the seams in a place where they would be less exposed to wear. The breaking of the thread of the seams, caused by such exposure, was the evil in the then existing state of the art, which he proposed to remedy.

Such an obvious improvement at once claimed the public attention. It was not only more useful, by rendering the leather-covered harness more durable, but it was more attractive to the eye than the trimmings finished in the old way. Hard rubber was already in use for covering harness mountings, and in order to meet the popular demand for this alleged new improvement in style as well as durability, the defendant corporation, having the control of the hard-rubber coating patents, used that material for covering their harness trimmings; substituting, however, two imitation stitch seams in the place of the two real stitch seams of the patent. Not quite sure, I imagine, that such a use of the form of his invention would be regarded as an infringement, and desirous of more completely covering the whole ground, the complainant filed an application for a design patent, which was issued to him June 13, 1871, and is the second

patent on which this suit is brought. In the specifications it is said to relate to a new design for covering harness trimmings, consisting in the formation of a groove or imitation seam near each edge of each covering. In his evidence the complainant states (page 26, Deft. Rec.) that he secured this patent "to prevent others, making harness trimmings with plastic material, from imitating my [his] patent."

The controversy, at the hearing, chiefly turned upon the question of the validity of these two patents. The learned counsel of the defendants maintained—

(1) That letters patent No. 99,032 were void for want of novelty; (2) that if not void they were not capable of receiving any construction which would make the defendants infringers; (3) that it appeared from the complainant's own testimony in the cause that the invention claimed in the design patent, No. 5,006, had been abandoned to the public by his manufacturing and selling harness trimmings, covering the design, more than two years before the patent was applied for.

1. Are letters patent No. 99,032 void for want of novelty?

The patentee states that he has invented a new mode of covering harness trimmings, whereby the rapid wear and destruction thereof are obviated. The new mode consists in abandoning the single seam in the center of the article to be covered, and adopting two seams at or near each edge, which leaves the center smooth and even. The defendants say there is nothing novel in this, and bring forward a number of witnesses to testify their knowledge of such a mode of covering long before the date of the complainants alleged invention. The testimony is sought to be illustrated by a number of exhibits. Defendant's Exhibits Nos. 7 and 39 were particularly relied on as showing an anticipation. Exhibit No. 7 was the ordinary hames, having the draft-eye covered with leather, with double seams; one seam on each edge. No. 39 was called the union or roller-fly hook, also covered with leather, and having the double seam. It seems to have been conceded on the argument that if articles represented by these exhibits were manufactured and put upon the market two years before the date of the complainant's invention, they clearly anticipated everything claimed by him.

It will be observed that it came out in the proofs that these exhibits were not in existence before the date of the complainant's invention, but had been made since for the purpose of illustrating what the witnesses said they had manufactured as early as 1859 and continued to manufacture as late as 1874. Why was this? Why were not some of the older articles found and exhibited? Not because

they were not made in large numbers.    Oscar Weiner says, page 3 of defendants' record:

"From about the year 1859 down to about the years 1873–4, our firm was largely engaged in making hames covered with leather, and draft-eyes covered with leather, in the way shown in this exhibit, [No. 7,] with the double seams, one seam on each edge.    We made and sold them during all these years to all the leading dealers in the country, and are selling them very largely to-day."

He further says, (page 61:)

"In 1864 or '5 we made trimmings covering the principle of stitching on each side, consisting of fly-hooks, [defendant's Exhibit No. 39;] and we covered some terrets."

Simon Weiner, of the firm of Weiner & Co., being shown Exhibit No. 7, states that they began to cover draft-eyes in hames with double seams, finished like the exhibit, in 1862, and have continued to cover them in that style up to the present time; that in 1864 and 1865 they began to cover terrets and fly-hooks with the two seams as a part of their regular business, and sold the goods to whoever wanted them.

Such testimony seems hardly consistent with two facts:

(1) That not a single article was produced in the case which was proved to have been made before the time of the complainant's invention; (2) that these gentlemen were sued in this court in the year 1873 or 1874 by the complainant for the infringement of these patents, and before a hearing they paid to the complainant $1,300 in cash, and took a license from him for authority to do what they now swear they have been for so many years in the habit of doing.

If the testimony left the case here I should not hesitate to overrule the defense that the complainant's patent lacked the quality of novelty.    But the complainant himself went upon the witness stand, and in his cross-examination testified as follows, (Defendant's Record, p. 31:)

"*Cross-question* 99. When did you first know of the leather-covered hames, like defendant's Exhibit 7, as shown at the draft-eye thereon? *Answer*, [examining articles.] Not until I made them first.    This is an imitation of my way of covering the draft-eye on a leather-covered hame.    *Cross-question* 100. Now, answer my question.    When did you first see that? *Answer*. Not till I first made them.    *Cross-question* 101. When was that? *Answer*. That was in 1865—in the spring.    *Cross-question* 102. Was any considerable number of them made and sold? *Answer*. Yes, sir.    *Cross-question* 103. Where were you working when you first made and sold them in 1865? *Answer*. I was in business for myself."

It should be added that subsequently in his cross-examination the witness insisted that the draft-eye on Exhibit 7 had but one

edge and one seam, and stated that such a finish of harness trimmings was not regarded as an infringement of his patent. But the court cannot agree with him in this. It regards such a manufacture as a clear anticipation of the complainant's patent, and his admission that he put upon the market a considerable number of such a manufacture as early as the spring of 1865, is fatal to its validity. It is not invention to transfer such workmanship from the draft-eye of the hames to the terrets and rings of the harness.

2. The second of the complainant's patents is for a design. The authority for such patents is found in section 4929 of the Revised Statutes, which provides that they may be issued to any person who invents any new and original design—

(1) For a manufacture, bust, statue, *alto relievo*, or *bas relief;* (2) for the printing of woolen, silk, cotton, or other fabrics; (3) for any new and original impression, ornament, print, or picture to be printed, painted, cast, or otherwise placed on or worked into any article of manufacture; (4) or for any new, original, and useful shape or configuration of any article of manufacture—the same not having been known or used by others before his invention or production thereof, or patented or described in any printed publication.

Patents for designs were first authorized by the third section of the act of August 29, 1842, (5 St. at Large, 543,) and have been retained, in substantially the same terms, in the several revisions of the patent laws since that date. They differ from patents for inventions or discoveries in this respect, that they have reference to appearance rather than utility. Their object is to encourage the arts of decoration more than the invention of useful products. A picture or design that merely pleases the eye is a proper subject for such a patent, without regard to the question of utility, which is always an essential ingredient in an invention or discovery patent. But, notwithstanding these differences, all regulations and provisions that are applicable to the obtaining or protecting of patents of the latter kind, are, by section 4933, made applicable also to design patents.

There is, therefore, no foundation for the argument of the learned counsel for the complainant, that design patents are not avoided from being in public use or on sale for more than two years prior to the application for a patent. The limitation applies to them, and an inventor is not permitted to exhibit his skill and taste in decorative art by the publication of elegant designs through a course of years, and then debar the public from any further use by obtaining letters patent for the same. The complainant admits that, as early as 1865, he made and sold articles of manufacture which reveal to

the eye the identity of design that characterizes the patent, and hence the patent is void for want of novelty.

3. The object of the third patent of the complainant (No. 167,040) is to protect the edges of the coverings of harness trimmings. The application for the patent was filed May 8, 1875. The patentee states, in his specifications, that in terrets and other covered harness mountings, as then in use, the edges of the coverings were much exposed, and were liable to be worn and defaced. The reins were also liable to be cut and rapidly worn out by rubbing against the sharp edges of the metallic parts, forming the inside of the terrets or other mountings. These defects were to be remedied by covering them on the under side with metal castings, having their edges raised up, or turned up and projecting, so as to form a groove on each side of the mounting for the reception of the covering.

I have examined the specifications and claims of this patent with great care, and if they embrace any new and useful invention, that is not fairly indicated and shown in the first and third claims of the prior patent, (No. 122,163,) issued to William Fawcett on the twenty-sixth of December, 1871, I have failed to discover it.

Fawcett's patent was also for an improvement in the mode of covering harness mountings. His first claim was for harness mountings, covered with leather or hard rubber upon the outer side, leaving the inner side uncovered to receive the plating; and the third claim was for the shoulder or recess formed upon the outer surface of harness mountings, to adapt them to receive a cover upon their outer sides. This is the foundation on which the complainant has builded, and while he has undoubtedly made an improvement, it does not seem to be such an improvement as involves invention. It is merely carrying forward the original conception, which Fawcett patented,—a new and more extended application of it,—involving change only in form, proportion, or degree. The supreme court, in *Smith* v. *Nichols,* 21 Wall. 112, said that this was not such invention as would sustain a patent. Following that decision, I am constrained to hold that this patent is also void.

The bill of complaint must be dismissed, with costs.