The **DIX–SEAL CORPORATION**

v.

The **NEW HAVEN TRAP ROCK COM-PANY** et al.

Civ. A. No. 8505.

United States District Court
D. Connecticut.

Dec. 12, 1964.

David Goldstein, Jacob D. Zeldes, Goldstein & Peck, Bridgeport, Conn., I. Jordan Kunik, Hartford, Conn., for plaintiff.

Harold M. Mulvey, Atty. Gen., Frederick Neusner, Asst. Atty. Gen., Hartford, Conn., for State of Connecticut.

William D. Templeton, Hartford, Conn., H. Meade Alcorn, Jr., R. Graeme Smith, Alcorn, Bakewell & Smith, Hartford, Conn., for defendant Material Service.

John W. Barclay, Thompson, Weir & Barclay, New Haven, Conn., Charles C. Winchester, W. R. Hulbert, Fish, Richardson & Neave, Boston, Mass., for defendant New Haven Trap Rock.

BLUMENFELD, District Judge.

This is a suit for infringement of a patent for a "HOT BITUMINOUS SURFACE TREATMENT AND PROCESS." The patent, United States Letters Patent No. 2,884,841, was issued to its inventor, Howard E. Dickinson, on May 5, 1959, on an application filed by him on August 21, 1957. The patent was then assigned to the plaintiff pursuant to an agreement executed on October 21, 1958, and recorded in the Patent Office on July 17, 1959. The original defendants are two Connecticut corporations who have admittedly used the patented process for many years. A third defendant, the State of Connecticut, was brought into the action after its inception.

The case arises under the Patent Laws of 35 U.S.C. § 281, and jurisdiction for the court is founded on 28 U.S.C. § 1338. The defendants have counterclaimed under 28 U.S.C. §§ 2201, 2202, seeking a declaratory judgment or decree holding said patent invalid or, if valid, not infringed by defendants.

The defendants have set forth in their answer a series of defenses to the infringement claim. They have challenged the validity of the patent on the ground that plaintiff's invention was "known or used by others in this country, * * * or described in a printed publication * * * before the invention thereof by the applicant for patent, * * *" under 35 U.S.C. § 102(a).[1] They have also raised the defense of shop rights in

---

1. 35 U.S.C. § 102(a):
    "A person shall be entitled to a patent unless—
    "(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, * * *."

the State of Connecticut which would allow for continued use of the process by the State or its agents. A third defense raised is that the patent is invalid because the process disclosed therein was described in a printed publication and/or was in public use for more than one year prior to the filing of the patent application. It is this double-barreled third defense that the court considers first.[2]

The relevant statutory section is 35 U.S.C. § 102(b) which provides:

"A person shall be entitled to a patent unless—

\* \* \* \* \*

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, \* \* \*."

The plaintiff has argued that the section is not applicable here for two reasons:

(1) That for a public use or a printed publication to defeat the validity of his patent it must be identical with the patented process, and that such identity has not been established; and

(2) that as to the uses, they were primarily for the purpose of experimentation.

## STATUTORY HISTORY AND PURPOSE

All United States patent laws are founded upon article 1, section 8 of the Constitution. Congress has been granted the power "to promote the Progress of Science and useful Arts, by securing for limited Times, to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The first patent act, the Patent Act of 1790, 1 Stat. 109, followed closely its English counterpart and contained the requirement that the invention must not have been "before known or used." Only three years later, however, the clause was

enlarged to "not known or used before the application." Patent Act of 1793, 1 Stat. 318. It was this part of the act which was the forerunner of the present § 102(b) and the introduction of that specific time period points up a distinction in the patent act which has often been overlooked. Section 102(b) is concerned with the actions of the inventor once he makes an invention that is novel and patentable. It imposes a condition that the inventor act with deliberate speed in filing his patent application or his rights to a legal monopoly will be barred.

The rationale for this requirement was set forth by Mr. Justice Story in Pennock v. Dialogue, 27 U.S. (2 Pet.) 1, 19, 7 L.Ed. 327 (1829):

"[T]here is much reason for the limitation thus imposed by the act. While one great object was, by holding out a reasonable reward to inventors, and giving them an exclusive right to their inventions for a limited period, to stimulate the efforts of genius; the main object was 'to promote the progress of science and useful arts;' and this could be done best, by giving the public at large a right to make, construct, use and vend the thing invented, at as early a period as possible, having a due regard to the rights of the inventor. If an inventor should be permitted to hold back from the knowledge of the public the secrets of his invention; if he should, for a long period of years, retain the monopoly, and make and sell his invention publicly, and thus gather the whole profits of it, relying upon his superior skill and knowledge of the structure; and then, and then only, when the danger of competition should force him to secure the exclusive right, he should be allowed to take out a patent, and thus exclude the public from any further use than what should be derived under it,

Jones v. Tucker Aluminum Products of Miami, Inc., 233 F.Supp. 403, 408 (S.D. Fla.1964).

2. The various conditions of § 102(b) are separate requirements each of which must be met to insure patentability.

during his fourteen years; it would materially retard the progress of science and the useful arts, and give a premium to those who should be least prompt to communicate their discoveries."

The dual purposes of preventing exploitation and giving the public the fruits of the discovery as soon as possible were reiterated by the Second Circuit 127 years later in Metallizing Eng'r Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2d Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946). To make the objectives of the law unmistakably clear, Judge Learned Hand separated them into two doctrines at p. 520 of 153 F.2d:

"(1) The effect upon his right to a patent of the inventor's competitive exploitation of his machine or of his process; (2) the contribution which a prior use by another person makes to the art. Both do indeed come within the phrase, 'prior use'; but the first is a defence for quite different reasons from the second. It had its origin—at least in this country —in the passage we have quoted from Pennock v. Dialogue, supra, 2 Pet. 1, 7 L.Ed. 327; i. e., that it is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly. It is true that for the limited period of two years he was allowed to do so, possibly in order to give him time to prepare an application; and even that has been recently cut down by half. But if he goes beyond that period of probation, he forfeits his right regardless of how little the public may have learned about the invention; just as he can forfeit it by too long concealment, even without exploiting the invention at all. Woodbridge v. United States, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159; Macbeth-Evans Glass Co. v. General Electric Co., supra, 6 Cir., 246 F. 695. Such a forfeiture has nothing to do with abandonment, which presupposes a deliberate, though not necessarily an express, surrender of any right to a patent. Although the evidence of both may at times overlap, each comes from a quite different legal source; one, from the fact that by renouncing the right the inventor irrevocably surrenders it; the other, from the fiat of Congress that it is part of the consideration for a patent that the public shall as soon as possible begin to enjoy the disclosure."

Similar discussions may be found in Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917); Kendall v. Winsor, 62 U.S. 322, 16 L.Ed. 80 (1858); Macbeth-Evans Glass Co. v. General Elec. Co., 246 Fed. 695 (6th Cir. 1917), cert. denied, 246 U.S. 659, 38 S.Ct. 316, 62 L.Ed. 926 (1918); National Cash Register Co. v. American Cash Register Co., 178 Fed. 79 (2d Cir. 1910); Hautau v. Kearney & Trecker Corp., 191 F.Supp. 430 (E.D. Mich.1961).

## DEGREE OF IDENTITY REQUIRED BY SECTION 102(b)

The plaintiff's first contention is that there was a lack of identity between the prior uses of the mix and the patented process. The plaintiff not only maintains that § 102(b) requires a greater degree of identity than that required for infringement purposes, but claims that defendants must prove that the public uses were exactly identical. This raises an interesting question concerning the interpretation of the statutory section.

As authority for his contention of law, the plaintiff relies on Draper v. Wattles, 7 Fed.Cas. 1061 (No. 4,073) (C.C.D. Mass.1878). There the court stated at p. 1063:

"The sale or use, to defeat the patent, must have been of the thing patented; and we are of opinion that, in order to defeat the patent, it is not enough to prove that the inventor has sold an earlier and less perfect article—that is, less perfect

in the sense of the patent law, even if the thing sold would be within the claim of the patent. In other words, the test is not, necessarily, whether the article sold would infringe the invention by embodying a part of it, but whether it is the invention— that is, embodies the whole of it. The law does not intend to say that a patentee dedicates to the public whatever he sells more than two years before he applies for a patent, but that he dedicates his invention if he sells it for that period."

But in Draper, the court itself noted that there was a substantial and "patentable" difference between the prior use and the patent. In comparing the two, the court said at p. 1062: "We think it very doubtful whether in that form the ring would have gone into general use, and that the last and patented article would not be a patentable improvement upon it." Thus the statement of the law, which was novel at that time, as far as I could determine, was not necessary for the decision.

The plaintiff has also cited Goodwin v. Borg-Warner Corp., 157 F.2d 267 (6th Cir. 1946), cert. denied, 329 U.S. 799, 67 S.Ct. 491, 91 L.Ed. 683 (1947), where the court, in purporting to follow Draper, said 157 F.2d at p. 272: "The public use which invalidates an invention under § 31, 35 U.S.C., 35 U.S.C.A. § 31, [the predecessor to § 102(b)] is a public use of the very invention patented." The words "very invention" in this statement were apparently a flourish to lend emphasis to a finding that the asserted public uses were of a type of clutch plate *widely different* from the one in the patent in suit and it obviously was not meant to state a standard for the degree of identity. The court later, at p. 273, did indeed consider a different public use which was of the patentee's own invention prior

to the date of his application, but held that it was experimental.

Support for the plaintiff's argument is also sought to be drawn from Chicopee Mfg. Co. v. Columbus Fiber Mills Co., 165 F.Supp. 307 (M.D.Ga.1958). There the court bolstered its use of the quotation from Goodwin v. Borg-Warner, supra, 157 F.2d 267, that the public use in § 102(b) must be of "the very thing patented," by suggesting 165 F.Supp. at p. 323 that "the language of 35 U.S.C.A. § 103 refers to Section 102 as requiring that the invention be 'identically disclosed.'" [3] That statutory construction suggested in Chicopee was subsequently specifically rejected by a reasoned decision in Bros., Inc. v. Browning Mfg. Co., 317 F.2d 413 (8th Cir.), cert. denied, 375 U.S. 825, 84 S.Ct. 67, 11 L.Ed.2d 58 (1963). In the Bros. case, the plaintiff had distributed a pamphlet with a brief description of his invention more than one year prior to his patent application. This was cited as a printed publication under § 102(b). The plaintiff, as in the case before this court, argued that § 103 imposed an exact identity test on § 102(b). The court in holding the patent invalid because of the publication rejected the exact identity test and used the legislative history of § 103 to show that there was no intention by Congress in passing § 103 to change the § 102(b) standards.

In none of these cases did the court rely upon a rule of precise identity to uphold the patent in question. Thus, I do not feel compelled to decide that complete identity of prior public use is necessary to bar a later patent. Nor am I persuaded to do so. The better rule, supported by the weight of authority, is set forth in 1 Walker, Patents 355–56 (Dellers ed. 1937):

"Precise identity between the thing covered by the patent, and the thing

3. Although dictum, since the patent in suit was nonetheless found invalid on another ground, the reasoning of the dictum in Chicopee supports the plaintiff's argument here. The court rejected the defense of prior public use because of a lack of "identity" despite an express finding that the other cloths were so similar that "any person having ordinary skill in the art of textile fabrics * * *" would have had no difficulty in constructing the cloth of the patent in suit. I respectfully decline to follow this dictum in Chicopee.

which the inventor allowed to be in public use or on sale more than two years before he applied for that patent, is not necessary to constitute constructive abandonment of the invention covered by the latter. It is enough if the two devices are substantially the same [Hall v. Macneale, 107 U.S. 90 [2 S.Ct. 73, 27 L.Ed. 367] (1883); Theberath v. [Rubber & Celluloid Harness] Trimming Co., 15 Fed. 246, 251 (1883)], or if the advance from one to the other did not amount to invention [International Tooth Crown Co. v. Gaylord, 140 U.S. 55, 62 [11 S.Ct. 716, 35 L.Ed. 347] (1891)], but it is not enough that the two devices perform the same function, and are somewhat similar in construction and in mode of operation. [Draper v. Wattles, 3 Bann. & Ard. 618, [7] Fed.Cas.No.4,073 (1878)]."

The Supreme Court opinion of Hall v. Macneale, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367 (1882), probably marks the beginning of this approach. There the court in discussing the form of the invention that had been in public use said at p. 97, 2 S.Ct. at p. 79:

> "The invention was complete in those safes. It was capable of producing the results sought to be accomplished, though not as thoroughly as with the use of welded steel and iron plates."

There was a distinct difference between the patented invention and that earlier form, but its prior use was still held to defeat patentability. The rule was followed in National Biscuit Co. v. Crown Baking Co., 105 F.2d 422 (1st Cir. 1939), which held a patent invalid on the ground of prior public uses. It rejected *sub silentio* the earlier dictum in Draper that such prior uses must have been "of the thing patented," in holding at p. 427:

> "Undoubtedly the machines on the alleged prior use must be capable of being operated commercially, but it is not necessary to prove that such earlier machines were as efficacious

as the one for which the patent was granted. Smith & Griggs Mfg. Co. v. Sprague, supra. If they embodied substantially the principles and elements of the invention, they invalidated the patent."

Similar holdings may be found in Atlas v. Eastern Airlines, Inc., 311 F.2d 156, 162 (1st Cir. 1962), cert. denied, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963); Sperry Rand Corp. v. Bell Tel. Labs., Inc., 208 F.Supp. 598 (S.D.N.Y. 1962), appeal dismissed, 317 F.2d 491 (1963); Morrill v. Automatic Indus., Inc., 93 F.Supp. 697 (W.D.Mo.1950). Also see Trimpak Corp. v. Schenectady Lumber Co., 29 F.Supp. 85, 89 (N.D. N.Y. 1939), aff'd mem., 119 F.2d 424 (1941), where the court cited Walker on Patents with approval.

In Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887), the Supreme Court had sustained a defense of prior public use based on the public use of a machine upon which he made substantial changes before he filed his application for a patent, pointing out at p. 265, 8 S.Ct. at p. 130:

> "That it was capable of improvement need not be denied, nor that, while it was in daily use, its owner and inventor watched it with the view of devising means to meet and overcome imperfections in its operation; but this much can be said in every such case. There are few machines, probably, which are not susceptible of further development and improvement, and the ingenuity of mechanics and inventors is commonly on the alert to discover defects and invent remedies."

If exact identity were required, § 102(b) would become a paper defense, for then what is earlier put in use with minor changes later could be patented and that which the law intended the public to have would be considered an infringement.

■■ The balance between encouragement of technological advancement by granting a legal monopoly to one who "in-

vents * * * any new and useful process," (35 U.S.C. § 101) and the interest of the public in having new inventions promptly available has been struck by Congress. The policy to expedite free public use which underlies § 102(b) expressly bars an inventor who does not file an application within one year after his invention has been in public use.[4] Once in public use, that invention becomes prior art and as to all later discoveries in that field anyone else must then show some "patentable" change to obtain the legal monopoly. Once the year in which to prepare and file his application has passed, the employment of a standard of patentability less stringent against the first inventor than against these others would seem to impair, if not defeat, congressional policy. There should be no distinction between prior art of the inventor's own making and that of others. Thus, in International Tooth Crown Co. v. Richmond, 30 Fed. 775 (C.C.D. Conn.1887), aff'd sub nom. International Tooth-Crown Co. v. Gaylord, 140 U.S. 55, 11 S.Ct. 716, 35 L.Ed. 347 (1891), the inventor sought a patent for an invention supplementing what he had permitted to be in public use more than two years before by a mechanical improvement which in itself had no patentable novelty. The inventor's earlier publicized process was held to have defeated his rights to the later patent. In affirming that decision, the Supreme Court applied the test of non-obviousness now in § 103:

> "All subsequent progress was * * such as would occur to an ordinarily skillful dentist. There is a multitude of cases in this court to the effect that something more is required

to support a patent than a slight advance over what had preceded it * * * [cited cases omitted]." (140 U.S. at 62, 11 S.Ct. at 719.)

While the theory upon which an inventor may lose his right to obtain a patent may in some respects be different from that which would preclude a right from ever arising, the underlying policies supporting both theories are the same. What has passed into public use may not thereafter be withdrawn by anyone, including the inventor, into a legally sanctioned monopoly. There must be a further development which would merit such a privilege.

### PRIOR PRINTED PUBLICATION

The plaintiff's argument as to the degree of identity required for a printed publication to bar a patent under § 102 (b) parallels its argument on identity for prior public use. The plaintiff does not deny that he could be forbidden a patent under § 103 on the grounds of obviousness were a general description of his process described in a printed publication prior to the date of his invention. But plaintiff contends that once he is established as the first inventor, he cannot be barred by a printed publication after the date of his invention, unless his process is "identically disclosed or described as set forth in section 102."[5] This contention has no basis in either law or policy.

It is a well established principle that for a printed publication under § 102(b) to bar patentability the publication must only describe the invention so that any person skilled in the art could use it or practice it without referring to the patent. Maibohm v. R.C.A. Victor

---

4. Section 102(b) is operative, even though that use has not been sufficiently "public" to defeat novelty of invention by another. See Metallizing Eng'r Mfg. Co. v. Kenyon Bearing & Auto Parts, supra, 153 F. 2d 516.

5. "§ 103. Conditions for patentability; non-obvious subject matter
   "A patent may not be obtained though the invention is not identically disclosed

or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Co., 89 F.2d 317 (4th Cir. 1937); Bros., Inc. v. Browning Mfg. Co., supra, 317 F.2d 413.

All the details need not be included. It is enough if the publication sufficiently describes that which is new and patentable so that the ordinary person skilled in the art could incorporate those new features into what he already knows and duplicate that which is set forth in the patent. The same policy considerations which support rejection of an exact identity requirement for prior public use are equally applicable here.

Although the time allowance of one year permitted under § 102(b) is an incentive concession to inventors which infringes upon the policy to expedite free public use, once the time allowed has passed, the test of what inventions are sufficiently new to be patentable under § 102(b) should be no different from the test codified in § 103. That is a test of general application. One distinction has been made between a printed publication as part of the prior art against which obviousness of an invention is tested for patentability under § 103 and a printed publication as a time bar under § 102(b), but this is a time distinction affecting what may be taken into account as being within the content of prior art at particular times rather than a qualitative distinction in the obviousness test. Application of Palmquist (50 CCPA ——) 319 F.2d 547 (1963), was an appeal from a Board of Appeal's decision affirming an examiner's rejection of all of Palmquist's claims on the ground of obviousness under § 103 over various combinations of references, each of which contained a printed publication of an article by Van Boskirk as a secondary reference. The Van Boskirk article had been published more than one year before the application was filed, but not before "the time the invention was made." The Court of Customs and Patent Appeals reversed at p. 551, "Since all of the rejections of the claims as 'unpatentable over the art' require the Van Boskirk publication." In holding that the question of obviousness "is to be determined as of 'the time when the invention was made,' as specified in 35 U.S.C. § 103,"[6] (p. 551) the court pointed out that printed publications which qualify only by reason of the time bars of § 102(b) must be considered alone and not as part of the general knowledge of a person skilled in the art. It stated at p. 550: "Van Boskirk, however, was published more than one year prior to appellants' filing date but since it does not 'describe' the claimed invention, it is *not* a statutory bar under 35 U.S.C. § 102(b)." However, this was hardly more than a tangential squint toward the plaintiff's argument, for less than one year later the same court, augmented by the participation of Chief Judge Worley, in Application of Brown (51 CCPA ——) 329 F.2d 1006, 1011 (1964), held that a description of an invention in a printed publication would be a bar under § 102(b) if from it alone the invention could be constructed and used "without the exertion of another's own 'inventive' skill." The use of quotation marks by the Court of Customs and Patent Appeals around the word "inventive" in this phrase[7] was obviously for the purpose of calling attention to a critical distinction in the patent law. This distinction had its inception in Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850), where the Supreme Court approved a charge to a jury that the patent was invalid if no more ingenuity or skill was required to construct the door knob than that possessed by an ordinary mechanic acquainted with the business. The court said at p. 266: "In other words, the improvement is the work of the skilful mechanic, not that of the inventor." Briefly, if those skilled in the art can understand the nature and operation of the invention and can carry it into practical use from

---

**6.** But see Hazeltine Research, Inc. v. Ladd, 226 F.Supp. 459 (D.D.C.1964).

**7.** The opinion shows the phrase to have been taken from a statement in 1 Robinson, Patents 451 (1890).

the description of it in a printed publication, the invention cannot be patented. Collins v. Owen, 310 F.2d 884, 887 (8th Cir. 1962). This is the same negative test first embodied in the Patent Act of 1952, 35 U.S.C. § 103, that what may be patented must not have been obvious to a person having ordinary skill in the art to which the invention pertains.[8]

### APPLICATION OF SECTION 102(b)

To determine against precisely what in the plaintiff's process any prior use or printed publication should be measured, the first step is to isolate the "new and useful" feature in Dickinson's process that justified a patent. Boiled down, the only novel feature of the patented process is to heat the specified ingredients to elevated temperatures, so that when combined together, the resultant mix is discharged at 300°F. to 340°F. It was this high temperature which Dickinson stressed as peculiarly his before the patent examiner. Everything else was old. The mix itself and the process for mixing had already been accepted features of the prior art of road maintenance materials. The marked improvement in the quality of the paving mix was due solely to this higher temperature which allowed for quicker drying and better adhesion to the road on which it was laid.

### I.

I turn first to the alleged printed publication.[9] After Dickinson tested his new process on State highways, he gave a public demonstration of the process for State officials. Convinced of the

value of what they had seen, these officials, aided by Dickinson, drew up an official State specification. This specification, The Connecticut State Highway Department Specification on Dense Gravel Bituminous Concrete for Surface Treatment, Reference File No. 138–A, was issued on October 5, 1954. Had there been nothing else in the case to bar Dickinson from obtaining a patent, Specification 138–A would be enough.

The purpose of such an official specification[10] is to set forth in detail approved methods of mixing and applying road maintenance materials. It is in the nature of a public document. Once adopted and published, it was sent to prospective suppliers who then prepared their bids on the basis of the stated process.

As was previously stated, to invalidate a patent, a printed publication must describe the invention so that any person skilled in the art can practice the invented process without referring to the patent itself. This was actually done by the publication of Specification 138–A. In the claims of the plaintiff's patent for method or process, the temperature of 300°F. to 340°F. is obtained by "heating said aggregates to an elevated temperature, heating a medium curing cutback asphalt containing asphalt and kerosene to an elevated temperature, mixing said heated aggregates and said heated cutback asphalt intimately, the respective elevated temperatures of said aggregate and of said cutback asphalt being controlled whereby the final temperature of the aggregate and cutback asphalt mixture is between 300°F. and 340°F." But

---

8. See Federico, Commentary on the New Patent Act, 35 U.S.C.A. § 1 to § 110 at p. 20, where, as part of the history of § 103, he quotes from the Committee report: "That provision paraphrases language which has often been used in decisions of the courts, and the section is added to the statute for uniformity and definiteness."

9. Although there may well have been sufficient distribution of copies of Dickinson's "History and Development" to constitute publication within the terms of

35 U.S.C. § 102(b), I have not so considered it here because notice of reliance upon it, as required by 35 U.S.C. § 282, was not given. I do not doubt that the Patent Office would have treated it as a prior art reference had it known of it. See Application of Brown, supra, 329 F.2d 1006. It may be regarded as an admission by the inventor, and I take it into account to that extent.

10. Specification 138–A was not brought to the attention of the Patent Office examiner.

while the temperature obtained depends upon control of the processing conditions, no description of the method for doing it is disclosed. Each of its claims tell what should be done, but none tell how to do it. No attempt was made to combine the instruction to heat the mix to a certain temperature with a description of the machine and method by which it is accomplished, other than by a reference in the specification of the patent that the aggregates "are heated in an asphalt plant to such temperature that, when inserted into the mixing chamber and coated with the MC–5 cutback asphalt (the bitumen having been heated previously to about 150°F.), the resulting mixture has a temperature of between 300°F. to 340°F." It would not seem critical to what temperature the cutback asphalt is heated, which of six grades of medium curing cutback (each of which contains a different per cent of diluent) is used, how long the mix is kept at a temperature between 300°F. and 340°F. or what kind of a mixing chamber is used. All of this information, which is lacking in the patent, may be found in Specification 138–A. For the specification not only contained what should be done, but it described how to do it in detailed step-by-step instructions.[11] This greater precision sprang naturally from the combined skills of those who drew it.[12] The defendants actually derived nothing from the patent issued in 1957; it could teach them nothing new.

In fact, the only variance claimed is between the temperatures stated in 138–A of 275°F. to 325°F. and those stated in the patent claims of 300°F. to 340°F. As to this variance, the effect is not as great as plaintiff would lead the court to believe, and certainly not so large as to prevent Specification 138–A from being a bar under § 102(b). According to an affidavit of the inventor himself which was filed in the Patent Office, the operational characteristics of the resulting product were the same at whatever temperature the process was used throughout the entire range of 300°F. to 340°F. Nor was there any other point of distinction whatsoever. Therefore, extending the range to 340°F. had no practical or theoretical significance. It did not contribute in one iota to the success of the process. Cf. In re Pilling, (18 CCPA Patents 703) 44 F.2d 878, 879 (1930). And while the specification did permit temperatures starting at 275°F. there was convincing evidence that it was widely understood in the industry to

11. Specification 138–A in 5½ single-spaced typewritten pages sets forth specific requirements for the ingredients and the process of the mix under some 22 separate headings. Typical headings are: Asphaltic Material; Coarse Aggregate; Mineral Filler; Sources of Supply; General Composition of the Mix; Formula for Job Mix; Plant and Machinery; Synchronization of Aggregate and Bitumen Feed; Equipment for Preparation of Bituminous Material.

12. It is understandable that the description of the method in the claims of the patent was so meagre. This was not because it was difficult to explain. The method of making hot mixes was well-known and regularly employed by skilled operators in road material plants. The stimulus which started Dickinson toward what was later patented took him to a plant where highway mixes were made. It had all begun with an on-the-job discussion of the inadequacies of the use of road oil and sand for road repairs. Mr. Burdick, Dickinson's superior, had said to Dickinson, "There must be a better way of handling the situation. How about using a fine graded bituminous concrete?" Dickinson went to the plant of Tomasso Bros., Inc., the State's regular supplier of materials in the area. He wanted something more fluid for easier spreading than the State's Specification 121 mix. MC–5, which is a cutback asphalt, was substituted for the straight asphalt in Specification 121. Heated, it became more fluid. By heating it high enough, the kerosene diluent was driven off and it dried quickly on application. Every one of the trial mixes which soon led to the one patented were made by Mr. Briganti, the plant operator, with its regular equipment and the materials on hand. Dickinson readily admitted that it was Briganti, a skilled plant operator, who supplied the know how. That is true except as to the higher temperatures. These were tried because of Dickinson's request.

mean that 300°F. was the desired temperature. In 1955, several commercial suppliers of highway construction materials submitted bids to furnish the State with mixes complying with Specification 138–A. Each bidder but one included his own formula for the specified mix to be furnished at a temperature of 300°F. The other one stated the temperature at 325°F. Specification 138–A taught far more about the process than the patent in suit.

## II.

The public uses of the patented process are even more revealing. Beginning in the Spring of 1954 and continuing thereafter at an increasing rate, many thousands of tons of mix using Dickinson's process were applied in the regular highway maintenance program of the State of Connecticut and its municipalities at a temperature of 300°F. and above. The plaintiff does not deny these uses. Rather, the plaintiff has argued that none of these uses were "identical" with the patented process. It is true that no one batch could have a temperature which encompassed the whole range of degrees between 300°F. and 340°F. But even using the test for identity that the plaintiff has urged this court to accept, any one batch mixed to a temperature falling anywhere between 300°F. and 325°F. would be as exact a reproduction of the patented process as it is possible to duplicate. The materials used were the same; the equipment used was the same; the successive steps taken were the same; the quality of the resultant product was the same; the process was the same.

The clear and compelling evidence has established beyond a reasonable doubt not only the substantial identity of the prior public use required by law, but, in fact, exact identity. There can be no conclusion other than that the patented process was in public use more than one year prior to the plaintiff's application for a patent.

## EXPERIMENTAL USE

■ The plaintiff attempts to avoid the bar created by the prior public use of his process by contending that these uses come within a judicially created exception from the time bar of § 102(b). A use by the inventor "which may be properly characterized as substantially for the purposes of experimentation" is not a public use under § 102(b). Smith & Griggs Mfg. Co. v. Sprague, supra, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1878); Aerovox Corp. v. Polymet Mfg. Co., 67 F.2d 860 (2d Cir. 1933). A public use and an experimental one are not mutually exclusive:

> "For plainly a given use may at the same time be both for purposes of experiment and for purposes of commerce. And where the use is motivated by both of these considerations, the case will fall within the implied exception only when the 'main purpose' of the inventor was one of experiment, the commercial feature of the use 'being merely incidental and subsidiary.'" (Metallizing Eng'r Co. v. Kenyon Bearing & Auto Parts Co., 62 F.Supp. 42, 55 (D.Conn.1945), rev'd on other grounds, 153 F.2d 516 (2d Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946)).

■ The plaintiff has the burden of proving that the uses were primarily for experimental purposes with the same degree of proof that was necessary for the defendants to establish that they were public. Aerovox Corp. v. Polymet Mfg. Co., supra. See Robine v. Apco, Inc., 227 F.Supp. 512, 518 (S.D.N.Y. 1964).

Almost every factor in this case which has been regarded as relevant in others to the issue of whether a public use is primarily for the purpose of a test by the inventor negates Dickinson's claim. First, the clear weight of the evidence refutes plaintiff's assertion that prolonged experimentation was necessary to

demonstrate the worth of the invention. It is conceded that the process was used to make the mix first applied on Route 5A in East Hartford and South Windsor, Connecticut, in the Spring of 1954.

Before that first job was completed, Dickinson had determined that at a temperature of 300°F. or better there was a quick cure—the initial tack was good almost immediately upon application, a crust formed on top, and traffic could be permitted to pass over the newly laid material within minutes after it was applied without any detrimental effect. Tomasso Bros., Inc., who were the suppliers to the State in that area, never deviated thereafter from processing the mix at temperatures of 300°F. to 325°F. Dickinson arranged and conducted a public demonstration of an application of the new mix to which the Highway Department's engineers in charge of road maintenance in all parts of the State were invited. Several copies of a typewritten report, entitled "The History and Development of a New MC–5 Pre-Mix Asphalt Surface Treatment," based on information furnished by Dickinson and prepared at the request of the district engineer, under whose authority Dickinson worked as a senior highway engineer in maintenance, were circulated among various officials of the Highway Department and others in November 1954. It explained all that had been done to arrive at a suitable temperature:

> "However, the mixture heated to 250–270°–F was slow curing. Increasing the heat to 300°–F caused evaporation of the light oils in vapor and smoke and caused quicker curing of the material.
>
> \*   \*   \*   \*   \*   \*
>
> "Our present experience indicates that for proper placement of the material the paving mixture temperature should be around 300°F. Suitable paving mixture limits would be between 275°F and 325°F."

Results of observation and of comparative tests against other materials used for the same purpose were also set forth. The report concluded:

> "We will, of course, have more definite proof of the benefits of this MC–5 work after a full year's cycle of weather conditions has been experienced. However, from the test on Route U.S. 5, East Hartford-South Windsor, which has already gone through a full hot season with no adverse effects and also with the installation made on the Charter Oak Bridge where an accelerated test under traffic has already been experienced, it is our contention that the mixture definitely has benefits that would warrant our including this material in our standard specifications, and it is hoped that the bid proposals for our requirements during the next maintenance season will include bids for this material."

The inventor's work was done. No problems remained for further development. He never attempted any. There is nothing to support a belief that he was not convinced that it would work well under service conditions. Cf. Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 157 F.2d 974 (2d Cir. 1946). Practical men in the road building industry and officials in the State Highway Department whose occupation embraced concern and responsibility for possible failure of the process were more than satisfied that no further testing was necessary. To cap it off, Dickinson was awarded a special meritorious increase in pay on December 22, 1955, upon the recommendation of his superiors, including the State Highway Commissioner, "for the *perfection* of a type of bituminous material which we believe will promote greater economy and better workmanship in the surface treatment of our roads, and particularly in urban areas." (Emphasis added.)

Secondly, the only kind of "test" he conducted after the Spring of 1954 was to prod or press the material with one foot after it was laid to see whether it would be moved aside or not. He had learned on the first job early in 1954 that the only mixes which did not set up or "cure" within a few minutes were those

which had not been subjected to a temperature of nearly 300°F. or better. That was a rough and ready test method to determine whether the mix had been processed at a high enough temperature. Although he testified that he made some notes of the result of such "tests," he was unable to produce any when he was called upon by order of the court to produce his records of those tests or experiments. Nor were any records of any particular field application with respect to which resistance to weather or wear were noted ever kept by Dickinson; nor did he keep any records of correlation between "curing" time and mixing temperatures. Dickinson never used the "tests" after the critical date in an experimental sense with an eye to perfecting the process. See Aerovox Corp. v. Polymet Mfg. Corp., supra, 67 F.2d 860.

Furthermore, from what has already been found, it is obvious that at no time did Dickinson make any attempt to keep secret any information relating to the claimed experiments or developmental work he had done on the new mix. No one who participated in the mixing, delivery, application or use of the process and its product was under any obligation of secrecy and no attempt was made to keep the process from public knowledge. See Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755 (1881).

■ Finally, the extent to which the process was used during this period would in itself be sufficient to defeat a defense of experimentation. Experimentation "should extend no farther, either in time or in the number of cases in which it is used, than is reasonably necessary for that purpose." International Tooth-Crown Co. v. Gaylord, supra, 140 U.S. at 63, 11 S.Ct. at 719.

Plaintiff has argued that certain discoveries, such as a process for repairing highways, require great lengths of time to determine what wear and tear over a period of years will do to it, citing the case of Elizabeth v. Pavement Co., supra, 97 U.S. 126, 24 L.Ed. 1000. While this may be true in certain circumstances, the argument appears to have been more of an afterthought in the present case. In Elizabeth, the patentee also developed a new method for repairing roads, but his experimentation consisted of only 75 feet of roadway constructed and applied at his own expense and on a road controlled by a corporation of which he was an officer. The court upheld the patent, but in carefully limiting its holding to the particular circumstances of the case before it said at p. 135:

> "But if the inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is, with his consent, put on sale for such use, then it will be in public use and on public sale, within the meaning of the law." And at p. 136: "Had the city of Boston, or other parties, used the invention, by laying down pavement in other streets and places with Nicholson's consent and allowance, then, indeed, the invention itself would have been in public use, within the meaning of the law; but this was not the case."

■ The plaintiff has not attempted to controvert the proof that many thousands of tons of the material made under Specification 138–A were applied to public highways for regular uses throughout the entire State before the critical date. In no case brought to the attention of the court in which the issue was raised was there a showing of such massive prior public use of the patented process as there has been here. Whatever "tests" he may have made were on public roads of material processed, purchased and applied at public expense. Not a single specific use or application was shown to have been for "experimental purposes." Wherever the fulcrum is placed, the public use was dominant.

## CONCLUSION

By both the public use of the patented process and its description in Specification 138–A, the world had been given a new process.

The invention of Dickinson was in public use and described in a printed publication in this country for more than one year prior to the date of application for a patent in the United States. This use was a commercial use and not an experimental use. 35 U.S.C. § 102(b).

Since it must be concluded that the plaintiff's patent is invalid, there is no need to consider other issues, even in brief compass despite the fact that they were vigorously contested at the trial and upon argument.

Litigation between parties contesting the validity of a patent has an effect upon the public interest beyond that in other cases. The inclusion of the State of Connecticut as a party defendant in this case makes it particularly appropriate that the decision should bear a clear impress of the court's opinion. For that reason, the determinative issues have been discussed at greater length than might otherwise have been the case.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and of the parties pursuant to 28 U.S.C. § 1338.

2. Patent No. 2,884,841 is invalid since the invention claimed therein was described in a printed publication in this country more than one year prior to the date of the application for the patent.

3. Patent No. 2,884,841 is invalid since the invention claimed therein was in public use in this country more than one year prior to the date of the application for the patent.

4. The public uses of the invention claimed in Patent No. 2,884,841 prior to August 20, 1956, were not primarily for the purpose of experimentation.

5. Since the patent is invalid, it becomes unnecessary to determine whether there was any infringement.

6. The defendants are entitled to a judgment dismissing the complaint and awarding costs to the defendants.

7. The defendants are entitled to a declaratory judgment on their counterclaim that the Dickinson Patent No. 2,884,841 is invalid.

This opinion shall constitute the Findings of Fact and Conclusions of Law of the court.

Let judgment be entered accordingly.